LOWELL HOLBROOK AND JAMES T. ARCHER, ASSIGNEES, &c., APPELLANTS, *vs.* B. F. ALLEN, APPELLEE.

The engagement of the drawer of a bill is collateral only, and ceases entirely upon failure of the holder to present it, when due, to the person who is directly liable. If it is presented and not paid, then notice must be given to the drawer—otherwise, all privity between the payee and the drawer is at an end.

An action for money had and received will lie for money paid by mistake. The acceptance of a bill constitutes the consideration of the indebtedness of the drawer to the acceptor.

The right of a debtor, in failing circumstances, (in making a deed of assignment) to give preference to one creditor over another, is unquestionable.

This was an action brought by Allen, in the Circuit Court of the County of Leon, against Holbrook and Archer, Assignees of the mercantile firm of Lloyd & Flagg, who failed in 1849. The suit was founded on two bills of exchange drawn upon and accepted by Lloyd & Flagg, prior to their failure. Judgment was rendered in favor of the plaintiff below at the Fall Term of the Circuit Court of Leon County, in the year 1850. From this judgment defendant appealed, and the case is brought up to this Court upon the following agreed statement of facts, to wit :

George W. Galphin, on the 18th day of March, 1848, drew his draft on the firm of Lloyd & Flagg, payable on the 21st December, 1848, in favor of one Neeley, for the sum of one hundred and sixty-seven and twenty-hundredths dollars, which was endorsed by Neeley to the plaintiff and was accepted by Lloyd & Flagg, and charged to the debit of Galphin on their books.

Lloyd & Flagg were the factors or merchants of Galphin, who is a planter, and were in the habit of accepting his bills and making advances to him, receiving his crops when made, and which were either purchased by them of him, or sold for his account, and proceeds of sale carried to his credit.

The bill in question was presented to Lloyd & Flagg for payment at or about the time of its maturity, but was not paid. No notice of such non-payment was given to the drawer.

On the 10th of January, 1849, the acceptors failed, and assigned their property, effects and assets to the defendants, in trust, to pay their debts according to certain priorities in the deed specified, and to which, if deemed material, reference is to be had. On the 11th January, 1849, the drawer, Galphin, sold to Lowell Holbrook, one of the assignees, the cotton which had been delivered prior to the asignment, and which was stored in the yard of Lloyd & Flagg, and the proceeds of such sale were passed to the credit of the account due Lloyd & Flagg. Galphin owed Lloyd & Flagg, at the time of the assignment, a note of $2,326 43-100, and a current open account of about $600, in which latter sum was included the amount of the draft which, on acceptance, had been charged as before stated. The cotton was insufficient to pay the entire indebtedness of Galphin, and a new note was given to the assignees for the residue.

It is further agreed, that on the 18th day of March, 1848, William M. Footman drew his draft on the firm of Lloyd & Flagg, payable on the 21st December, 1848, in favor of one

Neeley, for the sum of eighty-three dollars and sixty cents, which was endorsed by Neeley to the plaintiff, and was accepted by Lloyd & Flagg, and charged to the debit of Footman on their books.

The bill in question was presented to Lloyd & Flagg for payment, at or about the time of its maturity, but was not paid. No notice of non-payment was given to the drawer, according to the rules and principles of commercial law.

On the 10th January, 1849, the acceptors failed, and assigned their property, effects and assets to the defendants, in trust, to pay their debts according to certain priorities in the deed specified, and to which, if deemed material, reference is to be had. On the 11th January, 1849, the cotton which was delivered prior to the assignment, amounting to nineteen bales, was sold, and proceeds passed to the credit of Footman on the books of Lloyd & Flagg, by the defendants, assignees. Footman owed Lloyd & Flagg, at the time of the assignment, a note of $100 and an account of $100 and a debit for the amount of the draft, $83 60-100, all of which was paid by the sale of the cotton, and the residue of the proceeds of said cotton were, by agreement, passed to the credit of Edward Footman.

Judge BAKER, of the Middle Circuit, sat in the place of THOMPSON, Justice, who had been of counsel in Court below.

*Archer,* for Appellants. *Allen* and *Woodward,* for Appellee.

ANDERSON, *Chief Justice,* delivered the opinion of the Court, as follows:

This was an action of *assumpsit,* instituted in the Circuit Court for Leon County by B. F. Allen, against Holbrook and Archer, Assignees of the mercantile firm of Lloyd & Flagg.

The following statement of facts was agreed upon at the trial:—

Galphin, on the 18th of March, 1848, drew upon Lloyd &

Flagg, in favor of one Neeley, for the sum of $167 20. The draft was payable on the 21st of December, 1848. It was endorsed by Neeley to the plaintiff, Allen, and was accepted by Lloyd and Flagg, and duly charged to the debit of Galphin on their books. Lloyd & Flagg were the factors or merchants of Galphin, who is a planter, and were in the habit of accepting bills for him and making him advances, receiving his crops when made. These were either purchased by them or sold by them on Galphin's account, and the proceeds of the sale placed to his credit.

The bill in question was presented to the acceptors about the time of its maturity, but was not paid. No notice of this non-payment was given to the drawer.

On the 10th of January, 1849, the acceptors failed and assigned all their property to the defendants in this suit, in trust, to pay their debts according to certain priorities specified in the deed.

On the 11th of January, 1849, Galphin sold to Holbrook, one of the assignees, the cotton which had been delivered prior to the assignment, and which was stored in the yard of Lloyd & Flagg. The proceeds of the sale were placed to the credit of Galphin on an account due by him to Lloyd & Flagg. At the time of the assignment Galphin was indebted to his factors, (Lloyd & Flagg,) by note $2,326 43, and a current open account of about $600, in which last sum was included the amount of the draft. The cotton was insufficient to pay the entire indebtedness of Galphin, and a new note was given by him to the assignees for the balance.

It was further agreed that one Footman had drawn on the same parties for $83 60, at the same time and under the same circumstances. The material facts are the same in this case as in the other, except that the proceeds of the sale of Footman's cotton exceeded the amount of his indebtedness to Lloyd & Flagg, and the excess was placed to

the credit of Footman, by agreement between him and the assignees.

These facts are specially set out by the plaintiff in two several declarations, and he avers that by the respective payments made to the assignees by Galphin and Footman, they, the assignees, became indebted to the plaintiff in the amount of the two bills, with interest. The declaration also contains the common money counts and, among them, the count for money had and received by the defendants, to and for the use of the plaintiff.

The defendants plead in each case *non assumpsit.* The Judge of the Court below was of opinion that the law was with the plaintiff, and judgment was rendered in his favor against the defendants for the sum of $278 12, with costs. From this judgment an appeal was taken to this Court.

The action for money had and received is a species of equitable action very much in favor with the courts. Its principles are liberal beyond those of any other known to the law tribunals. It lies in almost all cases when a person has received money which, in equity and good conscience, he ought to refund. The want of privity is no objection to this action, for the law will imply a contract from the equity of the claim. "If the defendant," says Lord Mansfield, "be "under an obligation, from the ties of *natural justice,* to re- "fund, the law implies a debt and gives this action, founded "in the equity of the plaintiff's case, *quasi ex contractu,* as "the Roman law expresses it." 2 J. Burrow, 1015.

The plaintiff, then, in the case before us, may assert his claim in the perfect confidence that the courts will afford him sufficient remedy against the defendants, if his demand against them is *equitable and just.*

The money which he seeks to recover is the amount paid by Galphin and Footman to the defendants, in consideration of the acceptance by Lloyd & Flagg of their respective bills of exchange, drawn in favor of Neeley and endorsed to the plaintiff.

In investigating the nature of Allen's claim to this money it is necessary to consider, in connection with it, the claim which is in conflict with his. This conflicting claim is not that of Lloyd & Flagg, nor that of Galphin and Footman, nor that of the defendants to this suit. These last have no personal interest in this controversy. They represent, so far as this case is concerned, the preferred creditors of Lloyd & Flagg, and it is the justice and equity of the claim of these creditors to the fund in question that is really in conflict with the claim of Allen. The relation in which they stand to the other creditors of Lloyd & Flagg, as entitled to priority of payment, is fully sanctioned by well established principles. A debtor in failing circumstances, in making an assignment of his property, has undoubtedly a right to give preference to one creditor over another. 2 Story's Equity, 302.

To determine between the respective rights of these preferred creditors and Allen, it is necessary to refer to the circumstances under which the fund in dispute was paid to the defendants. Upon the acceptance of the two bills of exchange by Lloyd & Flagg, they became the primary debtors to Allen, and Galphin and Footman became the sureties of the debt, being only secondarily liable. "As between the acceptor and the payee it is not a collateral, but an original and direct undertaking. The payee accepts the acceptor as his debtor, and he cannot resort to the drawer but upon a failure of the payment of the bill.— The engagement of the drawer, therefore, may more properly be termed collateral." 2 Wheaton, 387.

Allen became, then, with his own entire consent, the creditor of Lloyd & Flagg, though retaining for a while his right of ultimate recourse upon Galphin and Footman, as sureties for the payment of the debt. But even this relation ceased between them after the 21st of December, 1848. On that day the bills fell due but were not paid, and no no-

tice of non-payment was given to the drawers. There does not seem to have existed any sufficient excuse for the omission of this notice, the acceptors being the factors of the drawers and receiving the crops when made, and the effect of the omission is a very familiar principle of commercial law. When a bill is duly presented for payment on the day it is due, and it be not paid, notice must be given to the drawer; otherwise he will be discharged from all liability, not only to pay the instrument itself, but also the debt in respect to which he became a party to it. Chitty on Bills, 465.

From this period, then, all privity between Allen and the drawers of the bills was at an end. By the consent of all parties, and by the operation of well known and well settled rules, Lloyd & Flagg became the sole debtors to Allen, and Galphin and Footman were indebted to Lloyd & Flagg, and to no one else. While these parties stood in this relation to each other, the rights of the other creditors of Lloyd & Flagg intervened and became vested in the defendants, Holbrook and Archer, as trustees. These rights were regulated by the deed of assignment made on the tenth of January, 1849, and it may be inferred from the statement of facts, as it was admitted in the argument, that Allen's claim as creditor was postponed to those of others more favored. The debts of Galphin and Footman to Lloyd & Flagg were a portion of the effects of the latter, and were conveyed with the rest to the defendants to be applied for the benefit of preferred creditors. Should they not be so applied?— Any right that Allen might have once had to this particular fund he had voluntarily abandoned when, on the 21st of December, 1848, by omitting the notice of non-payment, he released Galphin and Footman from their obligation to him, and was content to look to Lloyd & Flagg alone for the payment of the bills they had accepted. The preferred creditors certainly had a claim which might have been en-

forced against the assignees for the fund in question, since these had received it as a portion of the effects of the assignors, and were bound by the provisions of the deed of assignment to pay it to those creditors ; and it is difficult to conceive in what respect this claim can be called inequitable. Allen had abandoned his claim to it and contented himself with retaining his claim against Lloyd & Flagg alone.

But Allen, in his declaration, alleges that this money was paid to the assignees by Galphin and Footman by mistake, and he bases his right to recover it upon that allegation.— It is true that an action for money had and received will lie for money paid by mistake. Buller v. Harrison, Cowper, 567. But in this case is there any such mistake as the law here contemplates ? It may be, that when Galphin and Footman paid the money, they were under the impression that their respective bills of exchange had been paid, and that if they had been informed that such was not the case, they might, in ignorance of their legal rights and obligations, have declined paying the assignees. But this was a mistake as to the law which imports nothing ; and their mistake or ignorance of the facts was not material. Though they might have hesitated to pay the money due by them, its payment could have been enforced by the assignees. Therefore it is that Allen is in no wise concerned in the mistake made by them, if any was made. He could not make them pay him, and they would not have volunteered to do so, when they found that they could be compelled to pay the assignees.

The right of the assignees to enforce payment against Galphin and Footman, is derived from the nature of the contract of these last with Lloyd & Flagg. The acceptance by this firm of their drafts was the consideration for their indebtedness to him—the amount was charged to them on the books of the firm. After the 21st of December, 1848, they were released from all liability to Allen—Lloyd &

Flagg were substituted in their stead, as the sole debtors of Allen, with Allen's consent, and this, as we have said, was a sufficient consideration for the debt. Chitty on Bills, 85.

Lloyd & Flagg's liability to pay Allen still exists—their bankruptcy and assignment have not relieved them from it, and no delay or omissions of notice, on the part of Allen, will release them, until, by the operation of the statute of limitations, a presumption arises that payment has been made.

We think, then, that, regarding the rights of all the parties to this transaction, true equity dictates that Allen should be confined to the position he has selected for himself, that of a general creditor of Lloyd & Flagg, and that any attempt to relieve him, would only be at the expense of the paramount equities of others.

A case reported in 1st Barbour's Supreme Court Reports, at page 486, was relied on by plaintiff's counsel, as establishing Allen's right to look to the cotton, which is mentioned in the statement of facts, as the proper fund out of which the draft which he held should be paid. In the case referred to, a draft was drawn by a consignor of cotton upon the consignee, on account of such consignment, and was discounted by a bank, upon the faith of its being paid out of the proceeds of the cotton, and was accepted by the consignee—it was held, upon the failure of the consignee, that his assignees held the cotton, as a trust fund applicable to the payment of the draft. This was a proceeding in a Court of Equity. We are at a loss to discover in what material points this case resembles the one before us, even if we disregard the difference between the tribunals.

In the New York case, the draft was discounted on the credit of the cotton, and not of the consignee. In this, the cotton, which is claimed by Allen as an equitable fund for the payment of his drafts, was not in existence, and had not probably been planted at the date of the drafts. It does

.not appear that the drafts were drawn in reference to any particular cotton, even in embryo, nor, indeed, upon the faith of cotton at all. They may as well have been supposed to be drawn on the corn, the tobacco, or the sugar, which the drawers during the year either did, or might, have sent to their factors to be sold ; and still less does it appear that Allen's drafts were to be paid out of this particular cotton, rather than the remainder of the $2,936 21 due by Galphin, and the $283 60 due by Footman. All who dealt with the firm of Lloyd & Flagg, and became their creditors during the year 1848, were entitled to the same lien upon this cotton as Allen—that is to say, the lien belonging to them as general creditors, and nothing beyond, until a change was made by the operation of the deed of assignment. All traded with them alike, upon their general credit as merchants, and not upon the faith of any specified fund for security, as in the New York case.

We think, therefore, that the Court below erred in deciding that the law was with the plaintiff, and in giving him judgment against the defendants. It must be set aside, and judgment for the defendants with costs.

## SAME CASE, ON PETITION FOR REHEARING.

The Supreme Court cannot take original jurisdiction of a cause, even by consent of the parties, but an appeal from a final judgment of the Circuit Court may be heard and determined here, whether brought up regularly, according to prescribed forms, or when such forms are dispensed with by agreement.

Where a case is submitted to the Court, upon an agreed state of facts, for its judgment on the law, such submission is equivalent to a demurrer to the evidence. But where facts alone are submitted, and the Court is only called on to weigh the evidence, and decide accordingly, there being no question of law upon which the merits of the case depend, an appeal, or writ of error, does not lie.

The counsel for appellee applied for a rehearing in this case, and filed their petition according to the rule, setting forth the grounds of their application, substantially as follows :

1st. That Lloyd & Flagg, in the assignment of their effects, could not rightfully transfer to the appellants the cotton received from Galphin and Footman, the drawers of the bills held by Allen.   It was not their's absolutely, but only for the purpose of paying acceptances first, and then the accounts of those individuals.   The property, therefore, passed *cum onere*.   2d Story's Reports, 630, 638.   13th Peters, 483.   1st Condensed Supreme Court Reports, 137.

2d. The cotton was bound by the acceptance, because the acceptance was absolute, and the acceptors cannot divert it from the payment of the bills held by an endorsee, who has advanced his money upon the acceptance.   15th Peters, 394, 5, 6, 7.

3d. The assignees cannot occupy a better or a higher position than Lloyd & Flagg would themselves have occupied, if the assignment had not been made.   If the drawers had placed funds in the hands of the acceptors, (Lloyd & Flagg,) those funds were applicable to the payment of the acceptances, and could not be applied to other debts due from the drawers to the acceptors.   In this case, Allen's claim was due, and his right to be paid out of the proceeds of the cotton attached prior to the assignment to Holbrook and Archer.   See 16th Peters, 129, 130, 131, 132.

4th. The acceptance by Lloyd & Flagg is as if they had said in express terms, that the cotton in their hands should be held applicable, and should be appropriated to the payment of Allen's claims.   See the principle in 5th Wheaton, 277.   4th Condensed Supreme Court Reports, 647.   See, also, 5th Peters, 599.

5th. In answer to the view taken in the opinion of the Court, that Allen had abandoned his claim against Galphin,

13

it is submitted that this liability of Galphin was not considered as involved in the case ; and if it was, it is insisted that Galphin was not entitled to the notice of non-payment, which the Court thinks was necessary, but is liable for having withdrawn the fund which was properly applicable to the payment of the bill.

6th. The cotton in the hands of Lloyd & Flagg was a trust fund for the payment of the drafts. 1st Barbour's New York Reports, 488. They being the factors of the drawers, and receiving their crops, it mattered not whether the cotton was in existence or not at the time the bills were drawn. The cotton was actually delivered, as the record shows, prior to the assignment.

There were other reasons stated in the petition, as constituting a sufficient ground for the application, which are noticed in the opinion of the Court.

ANDERSON, *Chief Justice,* delivered the following opinion :

The Court have considered the petition filed in this case with the attention which the care and labor manifested in its preparation merit. They accede to most of the legal positions assumed by the counsel, but have been unable to perceive their application to the case as it is developed upon the record. A material fact is stated as if on the knowledge of counsel, but there is no evidence of it before us. It is said, " Lloyd & Flagg could not hold the cotton, because they had engaged to apply it to Allen." We find nothing of this engagement in the agreed statement of facts. The same thing is substantially re-asserted, in characterizing the nature of Lloyd & Flagg's acceptance. It is said, " their acceptance is nothing more nor less than if they had said in express terms, the cotton in our hands shall be held applicable, and appropriated to the payment of Allen's demand." If this is meant as a mere legal infer-

-ence, it assumes the fact that Allen's draft was the only one drawn by Galphin during the whole year, or, at least, had precedence of all others. This nowhere appears. On the contrary, the record shows that Lloyd & Flagg were in the habit of accepting his (Galphin's) bills, and making advances to him ;" and it also appears that, at the close of the year, Galphin was indebted to them near $3,000, which we are left to infer was the aggregate of the acceptances and advances they were in the habit of making.

We agree to the law, as stated in the petition, on the subject of a factor's lien, but we cannot see its application.— The whole of Galphin's cotton was appropriated to the payment of his debt to Lloyd & Flagg, and the factor's lien upon it was consummated by this appropriation. If this factor's lien enured to the benefit of any particular part of Galphin's debt, it nowhere appears that it was the part contracted, on account of the acceptance in favor of Allen.

The whole difference between the Court and the counsel appears to grow out of this, that the counsel seem to regard Allen's draft as the only one drawn during the year— while the Court are compelled to consider it as only about the seventeenth part of the aggregate of all the acceptances and advances. There is no evidence that Allen's draft had priority. On the contrary, it fell due only twenty days before the failure and assignment of Lloyd & Flagg, and it may reasonably be presumed to be among the last in the order of precedence.

The Court is referred by the petition to the record, as a reply to a remark in the opinion of the Court, " that the bill was not drawn upon any particular cotton, nor, indeed, upon the faith of any cotton at all." It was obviously the meaning of the Court, in making this remark, that Galphin, though, perhaps, known to the counsel as a cotton planter alone, was only made known to the Court as a planter, and who sent his crops to Lloyd & Flagg to be sold.

There may have been sugar, or tobacco, or corn, as part of the crop, for these are all staples of the country, and, therefore, the Court thought it a very vague supposition to identify a particular draft, constituting the seventeenth part of Galphin's whole indebtedness, with any particular lot of cotton, which may constitute but the seventeenth part of his crop.   There is nothing apparent to justify the identification ; and if it be said that Allen might select what funds he pleased, after it had passed out of the hands of Lloyd & Flagg, it would lead to this absurdity, that none of the cotton, or sugar, or corn, or tobacco, which had once belonged to Galphin, and had been sold by Lloyd & Flagg, could ever escape the operation of this lien, no matter through how many hands it had passed, nor how many and various forms it had assumed.

The Court is surprised to find at the conclusion of the petition, the following objection to the judgment of the Court : " One other point remains to be noticed.  This case was submitted to the Judge of the Circuit Court, upon an agreed state of facts.  There was no demurrer to the evidence, and no bill of exceptions.   Where, then, is the authority of this Court to adjudicate points of law—to decide questions of law raised by the pleadings, and instructions to the jury ? It cannot try the case as a jury, nor as the Court did below, by an agreement of the facts."

Little need be said in answer to this objection, beyond a reference to the agreed statement, signed by the counsel, who signs as senior counsel to this petition.  At the close of that statement, we find these words : " The foregoing are agreed upon as the facts of the case, and on which the judgment of the Court is prayed.   And it is further agreed, that if either party is dissatisfied with the judgment of the Court, the cause is to be carried by consent, without bond, in appeal to the ensuing term of the Supreme Court, to be docketed and tried during the term."

It is true, that if the subject-matter of this case was not within our jurisdiction, we should be bound to notice it, though the party were thus estopped by his own consent from raising the objection, but we do not so consider it. The maxim that consent will not give jurisdiction, is misunderstood, if it is supposed to mean that none of the forms prescribed as the ordinary mode of prosecuting appeals, may be waived by consent. The Supreme Court cannot take original jurisdiction, even by the consent of the parties, but they can hear and determine an appeal from a final judgment of the Circuit Court, either when brought up regularly, according to certain prescribed forms, or when those mere forms are dispensed with by agreement.

In 1st Florida Reports, 271, the Chief Justice, delivering the opinion of the Court, says : " The correct rule in the cases tried by the Court, sitting as a jury, would seem to be, that, where facts alone are submitted, and the Court has only to weigh the evidence and determine accordingly, no writ of error lies ; and where mixed questions of law and fact are presented to the Court for its decision, no writ of error lies, *unless the Court is called upon to decide questions of law*, or such questions of law arise necessarily out of the facts, and are distinctly presented to the Court upon them, *so that the decision of the points of law* will decide the merits of the cause, and the decision of the Court is wrong." In this case, such was the fact, and the submission of the agreed facts to the Court for its judgment on the law, was precisely equivalent to a demurrer to the evidence. The same rule is sanctioned in the case of the Southern Life Insurance and Trust Company v. Gray, 3d Florida Reports, 262.  5th Cranch, 358.  3d Cranch, 174.

The petition for a rehearing must be denied.